# 23-1340

## United States Court of Appeals
### *for the*
## Second Circuit

NESSA RISLEY, individually and on behalf of all others similarly situated,
JAMES FREELAND, ROBERT SCOTT, ANNIE VENESKY,
ANDREW CARDIS, DEAN MEYERS,

*Lead Plaintiffs-Appellants,*

– v. –

UNIVERSAL NAVIGATION INC., DBA Uniswap Labs, HAYDEN Z.
ADAMS, PARADIGM OPERATIONS LP, AH CAPITAL MANAGEMENT,
L.L.C., DBA Andreessen Horowitz, UNION SQUARE VENTURES, LLC,
UNISWAP FOUNDATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES
## UNIVERSAL NAVIGATION INC. AND HAYDEN Z. ADAMS

MAEVE L. O'CONNOR
ELLIOT GREENFIELD
BRANDON FETZER
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendants-Appellees
Universal Navigation Inc. and
Hayden Z. Adams*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee Universal Navigation Inc. d/b/a Uniswap Labs is a Delaware corporation.  Uniswap Labs certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE .................................................................. 2

I.     Nature of the Case ........................................................................ 2

II.    Statement of Facts ........................................................................ 5

       A.     The Parties ......................................................................... 5

       B.     The Protocol ...................................................................... 6

       C.     Liquidity Pools .................................................................. 7

       D.     Trading Fees ..................................................................... 10

       E.     The Interface ..................................................................... 12

       F.     Plaintiffs' Conflation of Labs, the Protocol, and the
              Interface ........................................................................... 13

III.   Plaintiffs' Claims ......................................................................... 15

IV.    The District Court's Dismissal ..................................................... 16

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT ......................................................................................... 20

I.     Plaintiffs Fail to State a Claim Against Labs Under Section
       29(b) of the Exchange Act. .......................................................... 20

       A.     Plaintiffs Fail to Plead Contractual Privity With Labs. ...... 21

       B.     Plaintiffs Fail to Identify a Contract That Violates the
              Exchange Act ..................................................................... 27

II.    Plaintiffs Fail to State a Claim Against Labs Under Section
       12(a)(1) of the Securities Act ....................................................... 30

A.    Plaintiffs Fail to Plead That Labs Passed Title of the Tokens. ................................................................... 31

B.    Plaintiffs Fail to Plead That Labs Solicited the Purchase of the Tokens. ........................................... 35

III.  Plaintiffs Fail to State a Federal Securities Claim Against Mr. Adams. ................................................................... 39

IV.  Remand to the District Court Is Appropriate With Respect to Plaintiffs' State Law Claims. ........................................... 40

CONCLUSION ........................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Credit Suisse Sec. (USA) LLC,*
  895 F.3d 214 (2d Cir. 2018) ................................................. 35

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
  671 F.3d 140 (2d Cir. 2011) ................................................. 11

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
  11 F.4th 138 (2d Cir. 2021) ................................................. 40

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................. 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ................................................. 5, 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................. 19

*Capri v. Murphy,*
  856 F.2d 473 (2d Cir. 1988) ................................................. 35

*Com. Union Assur. Co., plc v. Milken,*
  17 F.3d 608 (2d Cir. 1994) ................................................. 31

*Cosgrove v. Oregon Chai, Inc.,*
  520 F. Supp. 3d 562 (S.D.N.Y. 2021) ................................................. 5

*Credit Suisse v. ARM Fin. Grp.,*
  2001 WL 300733 (S.D.N.Y. March 28, 2001) ................................................. 35

*EMA Fin., LLC v. Vystar Corp.,*
  2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) ................................................. 21, 26, 28

*Frati v. Saltzstein,*
  2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ................................................. 20

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.,*
  41 F.4th 71 (2d Cir. 2022) ................................................. 22

iv

*Griffin v. PaineWebber, Inc.*,
   2001 WL 740764 (S.D.N.Y. June 29, 2001) ........................................ 37

*Holsworth v. BProtocol Fund*,
   2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ......................................... 37

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
   534 F. Supp. 3d 326 (S.D.N.Y. 2021) .................................................. 25

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F. 3d 347 (2d Cir. 2010) ................................................................ 30

*James v. Gage*,
   2019 WL 1429520 (S.D.N.Y. Mar. 29, 2019) ...................................... 11

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ................................................................. 19

*NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*,
   80 F.4th 413 (2d Cir. 2023) ............................................................ 27, 28

*Oberlander v. Coinbase Global Inc.*,
   2024 WL 1478773 (2d Cir. Apr. 5, 2024) ............................... 26, 34, 40

*Perry v. NYSARC, Inc.*,
   424 F. App'x 23 (2d Cir. 2011) ........................................................... 11

*Pinter v. Dahl*,
   486 U.S. 622 (1988) .................................................................... *passim*

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
   794 F. Supp. 1265 (S.D.N.Y. 1992) .................................................... 28

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................ 40

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) .................................................................. 19

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) .................................................................. 19

*Scottrade, Inc. v. BroCo Invs., Inc.*,
   774 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................. 21

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ...................................... 37

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ...................................................................18-19

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ........................................................................ 5

*Underwood v. Coinbase Global, Inc.*,
   654 F. Supp. 3d 224 (S.D.N.Y. 2023) .............................................. 33, 34

*Van Loon v. Dep't of Treasury*,
   2023 WL 5313091 (W.D. Tex. Aug. 17, 2023) ............................... 24, 35

*Williams v. Block.one*,
   2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) ...................................... 25

*Wilson v. Saintine Expl. & Drilling Corp.*,
   872 F.2d 1124 (2d Cir. 1989) ................................................................. 39

## Statutes & Other Authorities:

15 U.S.C. § 77b ............................................................................................... 20

15 U.S.C. § 77l(a)(1) ........................................................................................ 1

15 U.S.C. § 77o ................................................................................................. 1

15 U.S.C. § 78c ............................................................................................... 20

15 U.S.C. § 78cc(b) .................................................................................... 1, 20

15 U.S.C. § 78t(a) ............................................................................................. 1

28 U.S.C. § 1332(d)(2) .................................................................................. 40

## STATEMENT OF THE ISSUES

Plaintiffs assert claims against Defendants Universal Navigation Inc. d/b/a Uniswap Labs ("Labs"), Hayden Z. Adams, and the Uniswap Foundation, as well as venture capital firms Paradigm Operations LP, AH Capital Management, L.L.C. d/b/a Andreessen Horowitz, and Union Square Ventures, LLC (collectively, the "VC Defendants"). Plaintiffs assert claims against all Defendants under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc(b), and Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a)(1), as well as state law claims for aiding and abetting fraud, aiding and abetting negligent misrepresentation, and unjust enrichment and claims under Idaho and North Carolina state securities laws. Plaintiffs assert control person claims against Mr. Adams and the VC Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act, 15 U.S.C. § 77o, as well as under Idaho and North Carolina state securities laws.

This case presents the following issues for review:

1. Whether the District Court properly dismissed Plaintiffs' claims under Sections 29(b) and 20(a) of the Exchange Act where Plaintiffs failed to plead any contract between any Plaintiff and any Defendant, much less one that requires a violation of the Exchange Act.

2. Whether the District Court properly dismissed Plaintiffs' claims under Sections 12(a)(1) and 15 of the Securities Act where Plaintiffs failed to plead that any Defendant sold or solicited the purchase of the cryptocurrency tokens at issue.

## STATEMENT OF THE CASE

### I. Nature of the Case

Plaintiffs' claims relate to purported "scams" perpetrated by the issuers of certain cryptocurrency tokens (the "Tokens"), yet Plaintiffs do not name any of those supposed scammers in this lawsuit. Instead, they assert claims against Labs – a software company that developed the code underlying the decentralized cryptocurrency trading protocol that Plaintiffs used to acquire the Tokens – along with Mr. Adams, its founder and CEO, the VC Defendants and the Uniswap Foundation. Those claims necessarily fail because there are no well-pleaded factual allegations that Labs, Mr. Adams, or any other Defendant ever held

2

title or any other interest in the Tokens, much less sold the Tokens to Plaintiffs.

The Uniswap Protocol (the "Protocol"), which Plaintiffs allege they used to acquire the Tokens, is simply computer code running on the Ethereum blockchain – a system of "smart contracts," which Plaintiffs themselves describe as "self-executing, self-enforcing" code. Users trade tokens by means of "liquidity pools": for a specific pair of tokens traded on the Protocol, some users supply the tokens to a liquidity pool (the "liquidity providers"), and other users can then interact with the liquidity pool to trade one token for the other. At no point does Labs, the software company, have *any interest* in the tokens traded on the Protocol – *no title, ownership, custody or control*. A trading fee is paid by the purchaser to the liquidity pool, which automatically distributes the fee pro rata to the liquidity providers. The process is fully automated and, once launched, runs entirely independently of Labs. Indeed, just as the Bitcoin Protocol continues to operate many years after creator Satoshi Nakamoto disappeared, the Protocol would remain operational if Labs were to cease to exist.

Accordingly, Plaintiffs' central assertions – that their transactions constitute contracts with Labs and that the Tokens were sold to them by Labs – are wholly unsupported by their own factual allegations and, in fact, are directly contradicted by other allegations in the Amended Complaint and documents incorporated by reference. Plaintiffs' claims are based on the fundamentally flawed premise that, because Labs developed the computer code underlying the Protocol, it somehow "controlled" and "sold" all of the tokens that users later exchanged on the Protocol. That does not make sense, and the District Court properly considered the well-pleaded factual allegations and dismissed the Amended Complaint.

Ultimately, as the District Court recognized, to the extent Plaintiffs have any cognizable legal claims stemming from their purchases of the Tokens, the proper defendants would be the issuers of those Tokens who purportedly defrauded them. Recognizing that Plaintiffs' claims were asserted against the wrong parties, the District Court rejected Plaintiffs' attempt to hold "a drafter of computer code underlying a particular software platform" liable for "a third-party's misuse of that platform." (SPA31.)

## II. Statement of Facts[1]

### A. The Parties

Labs is a software company that is the main contributor to the Protocol, an open-source protocol for trading certain digital assets. (A34 ¶ 52.) Mr. Adams is the founder and CEO of Labs. (A27 ¶ 21.)

The VC Defendants are three unaffiliated and independent venture capital firms that each invest in private companies, such as Labs. (A28 ¶¶ 22-24, A49 ¶¶ 99-100.) Uniswap Foundation is a nonprofit corporation formed in June 2022 with a mission to support

---

[1] The factual allegations in the Amended Complaint are taken as true solely for the purposes of this appeal. The District Court properly took judicial notice of the Uniswap v2 Whitepaper and the Uniswap website, as well as other documents on which Plaintiffs rely in the Amended Complaint, and Plaintiffs do not challenge that decision. (SPA2 n.1.) *See Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (courts may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference," as well as "documents possessed by or known to the plaintiff upon which it relied in bringing the suit") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 581 n.5 (S.D.N.Y. 2021) (courts "may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination") (citation omitted). Copies of those documents were attached as exhibits to the Declaration of Brandon Fetzer. (A189-213.) Citations to "A_" refer to the Appendix filed by Plaintiffs-Appellants, and citations to "SPA_" refer to the Special Appendix.

"the decentralized growth and sustainability of the Uniswap Protocol and its supporting ecosystem." (A62-63 ¶¶ 159, 163.)

Plaintiffs are six individuals residing in North Carolina, Idaho, New York, and Australia who allege that they purchased certain identified Tokens using the Protocol during the period of December 2020 through March 2022. (A24 ¶ 5.)

### B.    The Protocol

The Protocol is computer code running on the Ethereum blockchain, which allows users to trade one cryptocurrency token for another. (A34 ¶ 52.) The first version of the Protocol ("v1") was developed by Labs and launched in 2018. (A34 ¶ 51.) Subsequent versions were launched in 2020 ("v2") and 2021 ("v3"). (A41 ¶ 77, A47-48 ¶ 96.) Although changes are made with each new version, the subsequent versions do not supplant or alter the prior ones, which Labs cannot change or update, and many users continue to use v1 and v2 despite the availability of v3. (A36 ¶ 57, A47-48 ¶ 96.) The new versions of the Protocol did not fundamentally change the mechanics of how users trade tokens. (A43 ¶ 81, A47-48 ¶ 96.)

The Protocol is autonomous, decentralized, and immutable; once launched, it runs entirely independently of Labs (or anyone else). The Protocol is simply a "system of smart contracts on the Ethereum blockchain." (A43 ¶ 81; A203.) Smart contracts are "self-executing, self-enforcing" computer programs, meaning that no person or entity controls the Protocol's operation, restricts who uses the Protocol, or decides which tokens are traded on the Protocol. (A32 ¶ 42; A212.) Indeed, for as long as the Ethereum blockchain continues to produce blocks, the Protocol will operate unaltered. (A208.)

The cryptocurrency tokens traded using the Protocol are known as "ERC-20 tokens" – tokens created using a technical standard of the Ethereum Protocol known as ERC-20. (A32 ¶¶ 43-44.)

### C. Liquidity Pools

Unlike *centralized* exchanges, where buyers and sellers typically are matched on a one-to-one basis using a centralized order book, often with centralized custody, clearing, and settlement, the Protocol is a *decentralized*, peer-to-peer system in which tokens are traded by means of "liquidity pools." (A31 ¶¶ 38-39, A41-42 ¶¶ 78-79; A192, A197; A203; A206.) Each pool contains two ERC-20 tokens, each valued relative to

the other.  (A41 ¶ 78; A203; A206.)  As one token is traded for the other, the relative prices of the tokens are automatically adjusted, and a new rate is determined.  (A41 ¶ 78; A203; A206.)

Users who place token pairs into liquidity pools are known as "liquidity providers."  (A31 ¶ 39.)  Anyone can become a liquidity provider by contributing tokens into a pre-existing pool or by creating a new pool, without permission from Labs or anyone else.  (A39 ¶ 72, A41 ¶ 77, A45 ¶ 89; A203; A206.)  In exchange for providing liquidity, these users automatically receive "pool tokens" from the Protocol, which represent their contribution to a pool.  (A42 ¶ 79; A203; A206.)  Liquidity providers can later "burn" their pool tokens to retrieve their contribution to the pool.  (A46 ¶ 92; A203; A206.)

The following diagram, which is included in the Amended Complaint and taken from Labs's website, illustrates how a liquidity pool works:



(A41-42 ¶ 78; A203; A206.)  On the left-hand side of the diagram is a

liquidity provider.  In this particular example, the liquidity provider

deposits 10 "A" tokens and 1 "B" token into a pre-existing liquidity pool,

and it receives 4 pool tokens in return, representing its contribution to

the pool.  On the right-hand side of the diagram is a trader who swaps

10 "A" tokens (plus a fee) for 1 "B" token.  The trader has no direct

interaction with the liquidity provider; the trader interacts only with

the liquidity pool.  (A41-42 ¶ 78.)

Liquidity pools are "smart contracts" that hold the tokens and

enforce the rules for depositing or withdrawing tokens.  (A31 ¶ 39, A32

¶ 42, A43 ¶ 81; A203; *see also* A208 ("It is important to reiterate that a

Pool is just a smart contract, operated by users calling functions on

it.").)  Those rules are written "directly into the program's code."  (A32

¶ 42.)  Accordingly, Labs does not have any control over, or any interest in, the tokens traded on the Protocol.

### D.    Trading Fees

As shown in the diagram of liquidity pools above, users paid a 0.3% fee to effectuate each trade when using v2 of the Protocol.  (A41-42 ¶ 78, A46 ¶¶ 91-92; A203; A206.)  In v3, there are multiple fee tiers.  (A47-48 ¶ 96.)  The trading fee was paid into the liquidity pool and automatically "distributed pro-rata to all [liquidity providers] in the pool upon completion of the trade."  (A46 ¶ 92; A192; A203; A206.)  Plaintiffs do not allege that Labs or Mr. Adams was a liquidity provider for any of the Tokens.

Although the Amended Complaint includes numerous conclusory allegations suggesting that Labs received fees for trades executed on the Protocol, Plaintiffs allege no facts supporting that assertion.  (A23 ¶ 3, A24 ¶ 4, A25 ¶ 9, A26 ¶ 12, A37 ¶ 63, A40-41 ¶ 76, A46 ¶ 91, A67 ¶ 178, A67-68 ¶ 180, A170 ¶ 711, A172 ¶ 722.)  At the pre-motion hearing held before the District Court on November 9, 2022, Plaintiffs expressly disclaimed any suggestion that Labs received such fees.  (D. Ct. Dkt. No. 64 at 26:7-16, 27:4-8.)  Likewise, in their briefing before the

District Court, Plaintiffs "abandon[ed] their theory that Labs collected fees for its own financial gain." (SPA48.)

Plaintiffs abandoned that theory for good reason, as it is directly contradicted by Plaintiffs' own admissions that trading fees are paid to the *liquidity providers*, which Plaintiffs do not allege includes Labs, as well as by documents incorporated by reference in the Amended Complaint. (SPA11; A46 ¶ 92 (trading fees "distributed pro-rata to all [liquidity providers]"); A192 (trading fee "goes to liquidity providers"); A204 (trading fees "function[] as a payout to LPs"); A207 (trading fees "distributed pro-rata to all LPs").) The Court need not accept as true any allegation that Labs received fees.[2]

---

[2] *See Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (court need not accept as true "factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice"); *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (holding that "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true"); *James v. Gage*, 2019 WL 1429520, at *14 (S.D.N.Y. Mar. 29, 2019) (holding that "[w]here the plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss").

As Plaintiffs note, v2 of the Protocol includes a "switch" to have a portion of the trading fee (1/6 of the .3% fee, or .05%) be paid to the Protocol rather than liquidity providers. (A46 ¶ 91; A203.) The Amended Complaint does not allege that the Protocol fee switch has been activated. (SPA48 n.17.) Whether the fee switch is activated at some time in the future has no bearing on Plaintiffs' claims, which are based on transactions that took place years ago.

## E.  The Interface

The Interface is front-end software developed by Labs that constitutes one way users can access the Protocol – it is one website among many that enable people to more easily interact with the Protocol. (A37 ¶ 64.) Users can reach the Interface by opening up any web browser and navigating to app.uniswap.org. (A37 ¶ 66.) Because the Interface is not the exclusive way to access the Protocol, only some users of the Protocol ever utilize the Interface. (A37 ¶ 64.) Even when a user accesses the Protocol via the Interface, all transactions are executed on the Protocol itself – as is always the case regardless of how the Protocol is accessed. (A37 ¶ 64, A41-42 ¶¶ 78-79.)

### F.     Plaintiffs' Conflation of Labs, the Protocol, and the Interface

In the Amended Complaint, Plaintiffs repeatedly conflate Labs (the software company), the Protocol (the decentralized exchange), and the Interface (the front-end software that can be used to access the Protocol) – using the term "Uniswap" to refer to all three. For example, although "Uniswap" is defined in the Amended Complaint to refer to Labs (A23), it is often used there to refer to the Protocol: "Uniswap's trading volume" refers to trading on the Protocol (A36 ¶ 57); the issuance of tokens by "Uniswap" refers to the tokens issued by liquidity pools on the Protocol (A42 ¶ 79, A46 ¶ 92); "Uniswap" pools refers to liquidity pools on the Protocol (A65 ¶ 171, A66-67 ¶ 174); and fees generated or charged by "Uniswap" refer to fees paid to liquidity pools on the Protocol (A31 ¶ 40, A37 ¶ 63, A40-41 ¶ 76, A46 ¶ 91, A48 ¶ 98).

As the District Court noted, Plaintiffs also use the term "Uniswap" in the Amended Complaint to refer to both the Protocol and the Interface, although "they are indeed distinct." (SPA22 n.8.) Plaintiffs do so in order to misleadingly suggest that Labs controls trading on the Protocol. (A40-41 ¶ 76, A48 ¶ 97, A54 ¶ 118, A70 ¶ 189.) For instance, Plaintiffs selectively quote from tweets by Mr. Adams to suggest that

13

Labs "maintained complete control over the Protocol," but those tweets actually make the opposite point, expressly contrasting Labs's *control* of the Interface with its *lack of control* over trading on the Protocol. (A48 ¶ 97; A210.) The webpage that Plaintiffs cite makes the same point, explaining that the Protocol, as compared to the Interface, "is a set of autonomous, decentralized, and immutable smart contracts." (A71 ¶ 190; *see also* A212.) Thus, Labs may block the use of the *Interface* for certain users or tokens, but Labs cannot prevent anyone from trading tokens on the *Protocol*. (A54-55 ¶¶ 118-20, A70-71 ¶¶ 189-190; A210; A212.)

On appeal, Plaintiffs continue this conflation of Labs, the Protocol and the Interface. Adding to the confusion, Plaintiffs now properly define "Labs" to refer to Uniswap Labs in their opening brief (App. Br. 1) but then provide *no definition at all* of "Uniswap" despite using that term throughout their brief. Plaintiffs' continued, deliberate use of "Uniswap" to refer to Labs, the Protocol and the Interface renders much of their brief misleading and incoherent.[3]

---

[3] As in the Amended Complaint, references in Plaintiffs' opening brief to the issuance of tokens by "Uniswap" refer to the tokens issued by liquidity pools on the Protocol (App. Br. 9, 19); "Uniswap" pools

### III. Plaintiffs' Claims

Plaintiff Risley commenced this action on April 4, 2022, asserting claims in connection with six tokens: EthereumMax, Bezoge Earth, Matrix Samurai, Alphawolf Finance, Rocket Bunny and BoomBaby.io. (D. Ct. Dkt. No. 1.)

On September 26, 2022, Plaintiffs filed the Amended Complaint, which includes claims regarding an additional 34 tokens: Akita, Archangel, Ares Protocol, Autz, Cyber Doge, Dent, Dogg Token, Ethereum Chain Token, Ethereum Max, FEGtoken, Goku Inu, Hoge.finance, HoloToken, Jupiter, Kawakami Inu, Kishu Inu, The Official Mine Token, Mononoke Inu, Pundi X Token, Saitama, Sanshu Inu, Smooth Love Potion, StarLink, Stoner Doge, Vera, YfDai.finance, Dogelon, HuskyToken, Lorde Edge, Shih Tzu, Wise Token, Lukso Token, Olympus Dao and Samsung Metaverse. (A24 ¶ 5.)

Plaintiffs contend that the Tokens were fraudulent "scams" and allege that they were injured when the Tokens decreased in value. For example, Plaintiff Freeland alleges that he purchased approximately

---

refers to liquidity pools on the Protocol (App. Br. 11, 19, 23, 24, 30-32); and fees charged or collected by "Uniswap" refer to fees paid to liquidity pools on the Protocol (App. Br. 11-12, 24, 32, 35-39).

18.6 billion Sanshu Inu tokens for $15.57, and that the value of those tokens had decreased to $1.19 as of June 1, 2022. (A124-126 ¶¶ 475-485; D. Ct. Dkt. No. 28-2 at 16.) Plaintiffs allege that the Sanshu Inu token was "a classic pump and dump scheme," in which the non-party issuers of Sanshu Inu "enriched themselves" at the expense of purchasers. (A126 ¶ 482.) Plaintiffs make similar allegations regarding the other Tokens, in each case alleging that they were defrauded by the non-party Token issuers. (A72-166 ¶¶ 195-696.) Although Plaintiffs devote five hundred paragraphs of the Amended Complaint to these alleged "scams" by the issuers of the Tokens, Plaintiffs do not allege any facts indicating that Labs or Mr. Adams (or any other Defendant) were even aware of those purported scams, much less that they participated in them.

Plaintiffs assert claims under Section 29(b) of the Exchange Act and Section 12(a)(1) of the Securities Act, as well as certain state statutory and common law claims.

## IV. The District Court's Dismissal

In a thorough, 51-page decision, the District Court dismissed the Amended Complaint in its entirety. (SPA50.) The District Court

16

dismissed Plaintiffs' Section 29(b) claims on the basis that Plaintiffs failed to identify any contract between any Plaintiff and Defendants that violates the Exchange Act. (SPA29-38.) The District Court also dismissed Plaintiffs' Section 12(a)(1) claims, holding that Plaintiffs failed to plead that Defendants are "statutory sellers" who passed title or "solicited" Plaintiffs to purchase the Tokens. (SPA38-48.) Finding no primary violation of the securities laws, the District Court dismissed Plaintiffs' control person claims, and it declined to exercise supplemental jurisdiction over Plaintiffs' state law claims. (SPA48-50.)

## SUMMARY OF ARGUMENT

The District Court correctly dismissed Plaintiffs' federal securities claims because Plaintiffs failed to plead the required elements of those claims.

*First*, Plaintiffs' claim under Section 29(b) of the Exchange Act, which states that a contract is void if its performance necessarily violates the Exchange Act, fails because Plaintiffs do not identify any contract between any Plaintiff and Labs or Adams, let alone one that requires a violation of the Exchange Act. The mere use by Plaintiffs of software developed by Labs – the Protocol and the Interface – to trade

17

the Tokens with third parties does not make Labs or Mr. Adams a counterparty to any of Plaintiffs' transactions.

*Second*, Plaintiffs' claim under Section 12(a)(1) of the Securities Act fails because Plaintiffs do not – and cannot – plausibly allege that Labs or Mr. Adams sold, offered to sell, or solicited Plaintiffs' purchase of any of the Tokens. The allegation that Labs and Mr. Adams developed the computer code underlying the Protocol does not, in any way, suggest that they had any ownership interest in the Tokens, much less that they ever held or passed title of the Tokens to Plaintiffs. Nor does the alleged use of social media to promote the *Protocol* constitute "solicitation" of the *Tokens*.

*Third*, Plaintiffs fail to state a claim for control person liability against Mr. Adams because they do not plead a primary violation by Labs.

The Court should affirm the District Court's dismissal of the federal securities claims.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's judgment granting Defendants' motion to dismiss. *Stratte-McClure v. Morgan Stanley*, 776

F.3d 94, 99-100 (2d Cir. 2015). A complaint is properly dismissed where, as here, it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs incorrectly rely on the "no set of facts" standard that the Supreme Court expressly rejected in *Twombly*. (App. Br. 18-19.)

In reviewing a motion to dismiss, the Amended Complaint is deemed to include "any statements or documents incorporated in it by reference," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), and the Court need not accept as true allegations in the Amended Complaint that are contradicted by such documents. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012). Nor is the Court "required to credit conclusory allegations or legal conclusions couched as factual allegations," *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013), or inferences that are "speculative" and unsupported by facts. *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007).

## ARGUMENT

I. **Plaintiffs Fail to State a Claim Against Labs Under Section 29(b) of the Exchange Act.**

Plaintiffs fail to state a claim for contract rescission under Section 29(b) of the Exchange Act because they do not plead any contract between any Plaintiff and Labs, much less any such contract that required a prohibited transaction. *See* 15 U.S.C. § 78cc(b) (stating that a contract "shall be void" if its performance "involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter"); *Frati v. Saltzstein*, 2011 WL 1002417, at *5 (S.D.N.Y. Mar. 14, 2011) ("To establish a violation of Section 29(b), the plaintiffs must show that (1) the contract involved a prohibited transaction, (2) they are in contractual privity with the defendants, and (3) they are in the class of persons the Act was designed to protect.") (alterations omitted).[4]

---

[4] As the District Court noted, Plaintiffs concede that there is no private right of action under Section 5 or 15(a)(1) of the Exchange Act, which respectively prohibit securities transactions on unregistered exchanges or effected by unregistered brokers or dealers. (SPA29 n.9.) Labs disputes that it is an "exchange" or "broker or dealer" as defined in Section 3 of the Exchange Act (15 U.S.C. § 78c) and that the Tokens are "securities" as defined in Section 2 of the Securities Act (15 U.S.C. § 77b), but the Court need not address those issues in order to decide this appeal.

### A. Plaintiffs Fail to Plead Contractual Privity With Labs.

Plaintiffs' Section 29(b) claim fails for the simple reason that they do not identify any contract between any Plaintiff and Labs. *See EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801, at *2 (S.D.N.Y. Mar. 29, 2021) (Section 29(b) claims require "contractual privity with the defendant"); *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 583 (S.D.N.Y. 2011) (dismissing Section 29(b) claim for lack of contractual privity). Plaintiffs' alleged use of the Protocol and the Interface is insufficient to plead contractual privity with Labs. (App. Br. at 24-26.)

*First*, as a threshold matter, "smart contracts" in this context are simply "self-executing, self-enforcing" computer code (A32 ¶ 42) and do not necessarily constitute legal contracts, which Plaintiffs acknowledge require the elements of "offer, acceptance, consideration, mutual assent and intent to be bound." (App. Br. 23.) Plaintiffs' conclusory assertions to the contrary do not transform computer code into legal contracts for purposes of Section 29(b). And Plaintiffs' generalized allegations that some "smart contracts" can be used to implement a legal contract – allegations that were not included in the Amended Complaint and

21

should be disregarded – have no bearing on the specific smart contracts that make up the Protocol. (App. Br. at 8, 12 n.6, 15 n.10, 26 n.15, 38 n.18, 24-26, 39 n.19.)[5]

*Second*, to the extent that a "smart contract" could – in some circumstances – be used to implement a legal contract, there is no basis to conclude that the *developer* of the underlying computer code is a *party* to that contract. Plaintiffs do not plausibly allege that Labs was a counterparty to any of their Token transactions or even was a liquidity provider with respect to the Tokens. Indeed, Plaintiffs do not plausibly allege that Labs ever owned, controlled, possessed or sold any of the Tokens to anyone. Plaintiffs therefore fail to plead contractual privity with *Labs*.

---

[5]  Plaintiffs' citation to sources not included in the Amended Complaint, including the Investopedia and IBM websites, YouTube videos, social media posts and news reports should be disregarded as Plaintiffs cannot amend their pleadings via their briefing. (App. Br. at 8, 12 n.6, 15 n.10, 24-25, 26 n.15, 38 n.18, 39 n.19; A230-296.) *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) ("[T]he law is clear that a party may not amend pleadings through a brief. [Plaintiff] is limited to factual contentions it alleged in its operative complaint.") (internal quotations omitted).

The District Court properly distinguished between the "overarching" or "foundational" smart contracts that comprise the Protocol from "the token contracts unique to each pool and drafted by [token] issuers." (SPA32.) "The contracts relevant to Plaintiffs' claims are *not* these overarching codes provided by Defendants, but rather the pair or token contracts drafted by the issuers themselves." (SPA33.) The District Court recognized – and correctly rejected – Plaintiffs' misguided attempt to assert claims against Labs, rather than the issuers who allegedly sold them the Tokens: "Unable to hold accountable those who drafted the token contracts, Plaintiffs resort to bringing claims against Defendants for drafting code for the Protocol writ large." (SPA33.)

Contrary to Plaintiffs' assertion, Labs has never suggested that Plaintiffs contracted with "software" or that "a computer program" or "computer code" sold the Tokens to Plaintiffs. (App. Br. at 2, 31.) The Court need not decide, for purposes of this appeal, whether the Token issuers or other liquidity providers are properly considered to be "counterparties" to Plaintiffs' transactions, in light of how tokens are exchanged using liquidity pools. The relevant point here, as the District

23

Court concluded, is that Plaintiffs do not plausibly allege that Labs –
the developer of the software underlying the Protocol – ever owned the
Tokens or sold the Tokens to Plaintiffs.

Nor did the District Court, as Plaintiffs contend, improperly draw
inferences in Defendants' favor to reach this conclusion. (App. Br. 19-
20.) Plaintiffs' own allegations make this clear. According to Plaintiffs,
"anyone with a basic understanding of Ethereum" can create and issue
their own ERC-20 tokens, which are themselves smart contracts. (A32
¶¶ 44-45.) An issuer can then make the token available for trading on
the Protocol by creating a liquidity pool – a smart contract that governs
the exchange of tokens in that pool. (A31 ¶¶ 38-39, A39 ¶ 72, A41-42
¶¶ 77-79, A45 ¶ 88-89; *see also* A193 (liquidity providers can "create
pair contracts for any two ERC-20s"); A203 (a pair contract "manages a
liquidity pool made up of reserves of two ERC-20 tokens"); A208
(a liquidity pool "is just a smart contract").) To the extent Plaintiffs'
transactions on the Protocol were governed by a legal contract, it is at
best those token or pair contracts, to which Labs was not party.

Plaintiffs' reliance on *Van Loon v. Dep't of Treasury*, 2023 WL
5313091 (W.D. Tex. Aug. 17, 2023), is misplaced. As the District Court

correctly concluded, the fact that a "smart contract" can sometimes be used to effectuate a "unilateral contract" does not imply that *all* "smart contracts" are legal contracts, much less that Labs would be a party to any relevant contract. (App. Br. 25-26, 28; SPA 34 n.11.) The *Van Loon* court's analogy of smart contracts to vending machines, which Plaintiffs highlight, illustrates the point. (App. Br. 25.) A vending machine is not itself a contract, but a tool that its owner or operator can use to offer a contract by stocking it with merchandise and setting prices. The *manufacturer* of the vending machine would not be a party to any such contract.[6]

*Third*, Plaintiffs' related assertion that each trade on the Protocol constitutes a "separate contract" with Labs is likewise unsupported by any factual allegations and was appropriately rejected by the District Court. (App. Br. 26-29; SPA32-33.) As this Court recently held, mere

---

[6] Notably, the decisions cited by the *Van Loon* court and by Plaintiffs here (App. Br. 28) for the proposition that "smart contracts" are unilateral legal contracts do not include any such holding and instead merely recite allegations by the plaintiffs in those cases. *See In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 330 (S.D.N.Y. 2021) (dismissing complaint based on lack of standing and statute of limitations); *Williams v. Block.one*, 2022 WL 5294189, at *2 n.19 (S.D.N.Y. Aug. 15, 2022) (denying motion for lead plaintiff).

25

allegations that Plaintiffs engaged in "losing transactions" are not sufficient to plead a "contract that gives rise to rescission under Section 29," in the absence of "allegations regarding the date or material terms of any transaction-specific contract." *Oberlander v. Coinbase Global Inc.*, 2024 WL 1478773 at *4 (2d Cir. Apr. 5, 2024); *see also EMA Fin.*, 2021 WL 1177801, at *2 (distinguishing between "unlawful contracts" and "unlawful transactions made pursuant to lawful contracts"). Again, although Plaintiffs refer broadly to certain of the Protocol's underlying smart contracts, they are unable to cite – with respect to any specific transaction – allegations setting forth the terms of any purported contract with Labs, when those terms were offered or accepted, the actions Labs was obligated to take, or the consideration Labs received. (App. Br. 28.)

*Fourth*, Plaintiffs provide no coherent explanation or factual allegations to support their assertion that they entered into contracts with Labs via their use of the Interface. (App. Br. 24.) As the District Court explained, and as Plaintiffs themselves alleged, the Interface is simply "a website through which investors can access the Protocol." (SPA15; A37 ¶64 ("Trading on the Protocol is conducted through

26

Uniswap's user interface"), ¶ 66 ("Users can access the Interface through a web browser").)  As they did below, Plaintiffs continue to misleadingly conflate Labs, the Protocol and the Interface, referring to them all without distinction as "Uniswap."  (App. Br. 24.)  As the Amended Complaint makes clear, however, all transactions are executed on the Protocol; the Interface does not execute any transactions.  (A41-42 ¶¶ 78-79.)  A user deposits a token into a liquidity pool on the Protocol (along with the trading fee) – it is not sent to Labs or the Interface – and the liquidity pool automatically sends a different token to the user in exchange.  (A37 ¶ 64, A41-42 ¶ 78.)  That users may link their digital wallets to the Interface has no bearing on how tokens are traded on the Protocol.  (App. Br. 24.)

**B.    Plaintiffs Fail to Identify a Contract That Violates the Exchange Act.**

Plaintiffs' Section 29(b) claim also fails because Plaintiffs do not allege the terms of any contract, much less demonstrate the existence of a contract that *requires* an illegal act in violation of the Exchange Act. *See NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 419 (2d Cir. 2023) (holding, in the context of identically worded provision of the Investment Advisers Act of 1940, that

"rescission is available only where the performance of the contract –
that is, fulfilling the contract according to its terms – involves the
violation of the [Act]").

As the Court observed in *NexPoint*, district courts in this Circuit
have interpreted Section 29(b) "to authorize rescission only when
performance of the contract *itself* is unlawful, not merely when the
*conduct* of a party to the contract is unlawful." *Id.* at 421 (emphasis in
original); *see also EMA Fin.*, 2021 WL 1177801, at *2 (Section 29(b)
only allows for the rescission of "unlawful contracts," not "unlawful
transactions made pursuant to lawful contracts."); *Pompano-Windy City
Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265, 1288 (S.D.N.Y.
1992) (dismissing Section 29(b) claims and noting that plaintiffs' failure
to allege "when the[] contracts were executed, which of the litigants
were parties to the contracts, and what terms and provisions of the
contracts violated the securities laws" makes it "difficult for the Court
even to review plaintiffs' claims").

The District Court noted that the Protocol's smart contracts and
the Interface can be used in connection with tokens that are not alleged
to be securities, such as Bitcoin or Ether, and therefore do not implicate

28

the federal securities laws. (SPA35.) Plaintiffs' attempt to suggest – for the first time on appeal – that all "assets traded on the Protocol," presumably including Bitcoin and Ether, are "securities" is improper and unsupported by factual allegations.[7] (App. Br. 29; A72 ¶¶ 195-198.)

As the District Court correctly concluded, it "defies logic that a drafter of computer code underlying a particular software platform could be liable under Section 29(b) for a third party's misuse of that platform." (SPA31.) It would be like "attempting to hold an application like Venmo or Zelle liable for a drug deal that used the platform to facilitate a fund transfer" or "a developer of self-driving cars liable for a third party's use of the car to commit a traffic violation or to rob a

---

[7] Plaintiffs' cited allegations relate to the Tokens, not to Bitcoin, Ether or stablecoins (DAI, USDT and USDC. (A72 ¶ 195 (alleging "Defendants promoted, offered, and sold the *Tokens* on the Protocol"); A72 ¶ 196 (alleging "assets" are securities because "their values are derived entirely from the efforts of others, including the *Issuers*"); A72 ¶ 198 (alleging "the Defendants and the *Issuers* engaged in countless unlawful transactions by soliciting, offering, and selling securities without registering the *Tokens* as securities"); A25 ¶ 6 (defining "Issuers" as the issuers of the Tokens).) In any event, a conclusory allegation that any and all unidentified "assets" that are traded on the Protocol are securities would be insufficient to state a claim.

29

bank."[8]  (SPA37.)  As is the case here, "collateral, third-party human intervention causes the harm, not the underlying platform."  (SPA37.)

## II.  Plaintiffs Fail to State a Claim Against Labs Under Section 12(a)(1) of the Securities Act.

Plaintiffs fail to state a claim under Section 12(a)(1) of the Securities Act because they do not adequately plead that Labs is a "statutory seller" – *i.e.*, that Labs either (i) was the "owner" of the Tokens and "passed title" to the Plaintiffs "for value" or (ii) "successfully solicit[ed]" Plaintiffs' purchases of the Tokens, "motivated at least in part by a desire to serve [its] own financial interests or those of the [Token] owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F. 3d 347, 359 (2d Cir. 2010) ("[T]he list of potential defendants in a section 12(a) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement.").

---

[8]  Indeed, unlike Venmo or Zelle, the Protocol (once launched) runs autonomously on the Ethereum blockchain, and Labs has no ability to block any user or any ERC-20 token from the Protocol itself or to regulate the transactions that take place on the Protocol.

### A. Plaintiffs Fail to Plead That Labs Passed Title of the Tokens.

Plaintiffs fail to satisfy the first prong of *Pinter* because they do not – and cannot – plausibly allege that Labs ever held title or other interest in the Tokens, much less "directly" sold the Tokens to Plaintiffs. *See Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994) (plaintiff must allege that it purchased the alleged security "directly from" the defendants); *Pinter*, 486 U.S. at 642 (stating that the language of Section 12(a)(1) "contemplates a buyer-seller relationship not unlike traditional contractual privity"). Plaintiffs do not allege that Labs issued any of the Tokens or provided liquidity to any of the pools they used to acquire the Tokens, let alone directly sold the Tokens to Plaintiffs.

Plaintiffs repeat their faulty argument that – merely by virtue of having developed the computer code underlying the Protocol – Labs therefore "controlled" the liquidity pool smart contracts and thus "held and passed title of the Tokens" to Plaintiffs. (App. Br. 31.) That makes no sense and is wholly unsupported by factual allegations. To the contrary, Plaintiffs acknowledge in the Amended Complaint that issuers or other liquidity providers add pairs of tokens to a liquidity

pool, and other users interact with the liquidity pool to swap one token for the other.  (A31 ¶ 39; A41-42 ¶¶ 78, 79.)  And Plaintiffs admit that Tokens traded on the Protocol are held by those liquidity pools, not by Labs.  (A43 ¶ 81 (the "pair contract . . . stores the liquidity providers' assets").)  Nothing in the Amended Complaint (or the documents incorporated therein) lends any support to the idea that Labs ever held title or other interest in the Tokens, or even for a moment had possession, custody or control of them.

The District Court provided a careful and thorough explanation of why Plaintiffs' theory "misperceives Section 12 liability."  (SPA40.) *First*, as the Supreme Court has emphasized, and as the District Court correctly held, Section 12 liability does not extend to participants who are not parties to a sale but instead are "collateral" to, or "facilitate," the sale.  (SPA40-41.)  *See Pinter*, 486 U.S. at 650 (Section 12 does not impose liability for "participants" who are "collateral to the offer or sale").  If the rule were otherwise, "shareholders would regularly sue the NASDAQ and/or New York Stock Exchange as a facilitator of any stock purchase that went awry."  (SPA41.)  Similarly, Section 12(a) "does not apply to software coders who create an exchange to efficiently

32

facilitate trades." (SPA41.) All the more so where, as here, the software coders do not control trading on the exchange.

*Second*, as noted above, tokens are exchanged on the Protocol by means of liquidity pools, and there is no basis to conclude that the liquidity pools – much less Labs – "holds title" to those tokens. (SPA42.) Labs, as a software developer, at most "can issue new versions and contracts, but not assume title" of the tokens exchanged on the Protocol. (SPA42.) Plaintiffs, for their part, acquired the Tokens by interacting with the liquidity pool smart contracts, which "instantly swap one token for the other," illustrating the "automated and non-custodial nature of the Protocol." (SPA42.) Plaintiffs' allegation that users trade by means of liquidity pools "does not mean that somehow Defendants have title (even momentarily) over each token on the Protocol." (SPA43.)

The decision in *Underwood* v. *Coinbase Global, Inc.* is instructive on this point. 654 F. Supp. 3d 224 (S.D.N.Y. 2023), *affirmed in part and reversed in part by Oberlander*, 2024 WL 1478773. In that case, the plaintiffs alleged that Coinbase, a *centralized* exchange, "'place[s] all deposited assets into a centralized wallet,' thereby controlling the title

33

to all the digital assets," and that customers interact only with "the wallet deposit address provided by Coinbase itself and that Coinbase owns." 654 F. Supp. 3d at 235; *Oberlander*, 2024 WL 1478773 at *4 (reversing dismissal of Section 12(a)(1) claim). Here, by contrast, Plaintiffs do not – and cannot – allege any of those facts with respect to the Protocol, a *decentralized* trading protocol, where Labs never once takes custody of any of the assets. Plaintiffs interacted with liquidity pools created by the Token issuers or other third parties, over which Labs had no control. There is no allegation that Plaintiffs ever sent any assets to Labs, that Labs deposited their assets into a centralized wallet it controls, or that Plaintiffs interacted with any deposit address that Labs owns. On this basis, the District Court found the facts in *Underwood* "plainly distinguishable." (SPA45 n.16.)

Ultimately, as the District Court concluded, "that Defendants may have drafted the contracts underlying the Protocol does not mean that they have title in the assets traded there." (SPA44.)[9]

---

[9] Plaintiffs again cite to *Van Loon*, but nothing in that decision supports Plaintiffs' position here that Labs held title or any other interest in the Tokens. (App. Br. 33.) *Van Loon* did not involve any of the same claims or legal issues that are present in this litigation and instead addressed whether the plaintiffs had a "property

**B. Plaintiffs Fail to Plead That Labs Solicited the Purchase of the Tokens.**

Plaintiffs cannot satisfy the second prong of *Pinter* because they fail to plead that Labs "successfully solicit[ed] the purchase" of the Tokens. *Pinter*, 486 U.S. at 647. The allegations that Plaintiffs cite on this point are either conclusory or suggest (at most) that Labs promoted the *Protocol* – not any of the *Tokens*. (App. Br. at 35, 38 (citing A25 ¶ 9, A34-35 ¶¶ 52-53, A57 ¶ 133, A72 ¶ 198, A175 ¶ 735).) As the District Court correctly concluded, "Plaintiffs offer nothing more than a conclusory allegation" that any of the Defendants engaged in solicitation with respect to the Tokens, which is "fatal to their claims." (SPA45.) Plaintiffs fail to allege facts showing that Labs "actually solicited their investment," *Capri v. Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988), and Plaintiffs' "bald allegation of solicitation" is insufficient to withstand a motion to dismiss. *Credit Suisse v. ARM Fin. Grp.*, 2001 WL 300733, at *9-10 (S.D.N.Y. March 28, 2001); *see also Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 222 (2d Cir. 2018) ("[B]ald assertions and conclusions of law will not suffice to avoid dismissal, nor

interest," as defined in certain Office of Foreign Assets Control regulations, in certain smart contracts from which they received fees. 2023 WL 5313091 at *5-6, *9-11.

will factual allegations that are wholly conclusory.") (internal quotations and citations omitted). Plaintiffs do not – and cannot – cite a single allegation in the Amended Complaint in which Labs solicited the purchase of any of the Tokens.

At most, Plaintiffs allege that Labs solicited the use of the Protocol in general – not any of the Tokens. As the District Court correctly concluded, tweets by Mr. Adams that the Protocol was "secure" and "for many people" do not constitute solicitation of the Tokens. (SPA46.) Accordingly, Plaintiffs' focus on whether social media posts can be a means of solicitation misses the point: there are no allegations of any social media posts by Labs soliciting the purchase of any of the Tokens. (App. Br. 34-35.) And none of the cases that Plaintiffs cite in support of their claim of solicitation support their position, as they all involved solicitation with respect to the particular security at issue, not – as here – the general use of what Labs believes is a price-efficient and secure trading protocol. (App. Br. 37.) Positive statements about the Protocol itself is "too attenuated to state a claim." (SPA46.) "After all, no plaintiff would sue the New York Stock Exchange or NASDAQ for

tweeting that its exchange was a safe place to trade after that plaintiff had lost money due to an issuer's fraudulent schemes." (SPA46.)

Having failed to plead actual solicitation of the Tokens, Plaintiffs also fail to plead that any such solicitation was "successful," as required by *Pinter*. 486 U.S. at 647. Plaintiffs' failure to plead this element is "independently fatal" to their claims. (SPA45-46, SPA48.) Plaintiffs do not (and cannot) allege that they purchased the Tokens "as a result of [Labs's] solicitation." *Griffin v. PaineWebber, Inc.*, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001); *see also Holsworth v. BProtocol Fund*, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 12 claim where plaintiff failed to show "that he was directly contacted by Defendants or that he purchased securities as a result of any active solicitations by Defendants"); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing Section 12 claim where plaintiff failed to plead solicitation or that "plaintiff in fact purchased the Certificates as a result of [defendant's] solicitation").

Plaintiffs also fail to allege that any supposed "solicitation" by Labs was "motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." *Pinter*, 486 U.S. at

37

647.  As the District Court noted, Plaintiffs "abandon[ed] their theory that Labs collected fees for its own financial gain." (SPA48.)  Any suggestion that Labs received trading fees is contradicted by Plaintiffs' own allegations in the Amended Complaint (as well as documents incorporated by reference) that trading fees are paid to the *liquidity providers*, not to *Labs*.  (*See* § II.D. above.)  Plaintiffs' half-hearted attempt to revive this abandoned theory on appeal remains wholly unsupported by any factual allegations.  (App. Br. 38-39 (citing SPA40 n.15, A37 ¶ 63, A47-48 ¶ 96).)  It is also contradicted by admissions elsewhere in their brief.  (App. Br. at 11 (trading fees are "distributed to liquidity providers").)[10]

In any event, fees received in connection with any and all trades on the Protocol (or by means of the Interface) would not be tied to any purported solicitation of the Tokens; nor would they be sufficient to plausibly allege solicitation "motivated" by financial interests.  *See*

---

[10]  Plaintiffs note that, in October 2023, Labs "enacted a new 0.15% fee." (App. Br. 11-12 & n.6, 39 & n.19.)  This fee relates to use of the *Interface* – not the *Protocol* – and has no bearing on Plaintiffs' claims because it was enacted years after the events giving rise to this lawsuit.  *See* https://support.uniswap.org/hc/en-us/articles/ 20131678274957-What-are-Uniswap-Labs-fees (cited at App. Br. 39 n. 20).

*Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1126-27 (2d Cir. 1989) (Supreme Court's "concern" in *Pinter* "had to do with persons such as brokers who might act on the seller's behalf for a profit" – *e.g.*, those who "earn a commission from an actual seller for persuading [buyers] to make a particular investment").

At bottom, as the District Court correctly concluded, there is "simply no intellectually honest way to read Section 12(a)(1) in a manner that allows the Court to reach Plaintiffs' requested outcome." (SPA47.)

## III.   Plaintiffs Fail to State a Federal Securities Claim Against Mr. Adams.

Plaintiffs fail to state a claim against Mr. Adams under either Section 29(b) or Section 12(a)(1) for the same reasons stated above with respect to Labs.  Plaintiffs fail to identify any contract between themselves and Mr. Adams, much less one that on its face violates the Exchange Act.  Nor do Plaintiffs adequately plead that Mr. Adams was a "statutory seller" who either passed title in the Tokens to Plaintiffs or successfully solicited their purchase of such Tokens.

Plaintiffs also fail to state a claim for control person liability against Mr. Adams under either Section 20(a) of the Exchange Act or

Section 15 of the Securities Act because they do not adequately plead a primary violation by Labs. *See Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004) (affirming dismissal of Section 20(a) and Section 15 claims where plaintiffs failed to plead a primary violation).

## IV. Remand to the District Court Is Appropriate With Respect to Plaintiffs' State Law Claims.

Defendants do not contest that Plaintiffs alleged jurisdiction over the state claims under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). (A28-29 ¶ 25.) Although Plaintiffs fall far short of stating a claim for many of the same reasons described above (and in the VC Defendants' brief), this Court's "general policy" is to allow the District Court to consider the parties' arguments as to those claims in the first instance. *Oberlander*, 2024 WL 1478773, at *5 n.9 (citing *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021)).

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision of the District Court as to Plaintiffs' federal claims and remand for consideration of Plaintiffs' state law claims.

Dated: April 12, 2024

Respectfully submitted,

/s/ *Elliot Greenfield*
Maeve O'Connor
Elliot Greenfield
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
mloconnor@debevoise.com
egreenfield@debevoise.com
bfetzer@debevoise.com

Attorneys for Defendants-Appellees Universal Navigation Inc. and Hayden Z. Adams

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.     This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 8,111 words, exclusive of the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated:  April 12, 2024

*/s/ Elliot Greenfield*
Elliot Greenfield

42

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024 I caused the foregoing Brief of Defendants-Appellees Universal Navigation, Inc. and Hayden Z. Adams to be filed with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system and served on all counsel of record via CM/ECF.

Dated: April 12, 2024

*/s/ Elliot Greenfield*
Elliot Greenfield